**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

    **v.**                                                                  **1:04-CR-340**

**ABRAHAM PEARSON,**

        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

**I.     INTRODUCTION**

Defendant was convicted upon his guilty plea of multiple counts of producing, transporting, receiving, and possessing child pornography. This Court sentenced him, *inter alia*, to 15 years' incarceration and to pay restitution to the child victims of his crimes in the amount of $974,902.00. On appeal, the United States Court of Appeals for the Second Circuit affirmed the conviction and sentence with the exception of the restitution order. See United States v. Pearson, --- F.3d ----, 2009 WL 1886055 (2d Cir. July 02, 2009)(*per curiam*). The Court of Appeals vacated that part of judgment ordering restitution and remanded the matter "simply to secure a more thorough explanation from the district court as to the basis for its restitution determination." Id. at * 5; see id. at * 6 (The matter is remanded "for the limited purpose of ordering restitution consistent with this opinion.").

1

This Decision and Order constitutes the Court's explanation as to the basis of the restitution order.

**II.     DISCUSSION**

    **a.     Background**

Defendant's crimes involved two minor female victims, Jane Doe # 1 and Jane Doe # 2. Defendant subjected these victims, ages seventeen and fifteen, respectively, to repeated and various forms of sexual contact, including sadistic or masochistic sexual conduct, that he video-taped and photographed. Defendant also shared the images with a friend over the Internet. In his Plea Agreement, Defendant agreed, *inter alia*, "to pay restitution in full to any person who would qualify as a victim, under 18 U.S.C. § 3663 or § 3663A, of [Defendant's] offenses." Plea Agreement ¶ 1(c). The government contended that both victims suffered traumatic psychological injuries from Defendant's crimes and that, as a result, both victims required intensive and long term psychological treatment regimens. The government sought restitution in an amount sufficient to pay for the treatment regimens that each victim would likely require in the future.

In support of its restitution request, the government retained the services of Dr. Kenneth Reagles, the owner of K.W. Reagles & Associates, L.L.C., a company that provides "[f]orensic vocational, rehabilitation, and economic consultation services, as well as employee assistance, case management, and psychological counseling services." Dr. Reagles prepared thorough reports for both victims wherein he reviewed the victims' familial histories, their education and work histories, and their prior medical histories. Dr.

Reagles also interviewed the victims and reviewed their mental health diagnoses and treatments received since their victimizations by Defendant. Dr. Reagles reported his findings and drew opinions as to the victims' needs for future mental health related goods and services. Finally, Dr. Reagles calculated the costs of the future mental health related goods and services that, he opined, each victim would require as a result of Defendant's crimes. While Defendant provided a psychologist's report addressing the potential that Defendant would re-offend in the future, Defendant did not provide an expert report addressed to Dr. Reagles' conclusions or otherwise challenge those conclusions other than to assert that they were based on mere speculation.

The Court also reviewed victim impact statements and heard from the mothers of both victims at the sentencing hearing. Both mothers provided compelling statements of the immense effects that Defendant's crimes had upon the mental healths of their daughters, and the psychological changes exhibited by each girl since their involvement with Defendant.[1] [2]

---

[1] In addressing the Court, and responding to defense counsel's argument that the amount of the restitution sought by the government amounted to "jackpot justice [], like a winning lottery ticket," Jane Doe # 2's mother stated, in part:

> It's a mixed blessing to be invited to address this Court; mixed because of the damage that was done to my daughter, my family and me. And it's so extensive, so enormous and so long-term that it's impossible to describe it accurately and succinctly. I pride myself on my speaking skills, and even as I prepared this statement for the past year, when we thought it was going to trial earlier, I found it almost overwhelming to do so.
>
> To call this jackpot justice is not to know that we spent my son's and my daughter's college funds on my daughter's treatment to date. That at certain points, health insurance doesn't cover more than 20 visits a year, and when you're doing four visits a week to try to help your daughter sleep nights and not cut herself and not do other damage, because she feels so badly about how she was victimized, you can't imagine what those costs amount to. Not to even suggest that I was without treatment, my husband, my son.
>
> Winning the lottery, sir, doesn't often cause post-traumatic stress disorder, panic attacks,

(continued...)

3

[1](...continued)
anxiety. Sleepless nights? You want to talk about sleepless nights? Let's address that for a moment. What does it say about the emotional damage to my daughter, who decides to commit suicide, and because I was home with her, I became aware of this plan? Even discovering her will, in which she noted, as a 15-year-old would, what ones of her dolls should go to her grandma, what ones of her CDs should go to her brother and what should remain with me.

And then her urgent plea, "Please don't put me in the ground, mama. I'm so afraid of the dark." My daughter hasn't slept in a dark room in three years. Because this deviant also threatened her after he was reported, she has lived in fear, not because she believes anything except that for some reason he's gonna come after her. My whole family has suffered.

(Addressing the defendant): [My daughter] will never be the same child that walked into your home the first time. Your deviant appetite and pressure and manipulation of her behavior was catastrophic . . . .

Sent. Trans, pp. 23-25.

[2] Jane Doe # 1's mother provided a similar account of the traumatic effects of Defendant's crimes upon her daughter, stating, in part:

No therapy or compensation is sufficient to erase the damage that this man, Abe Pearson, has inflicted on my daughter and on [Jane Doe # 1] and, subsequently, on the rest of our family, a loss of a vivacious daughter and a caring sister to six other children, during and subsequent to his use and abuse of her. He intentionally targeted a very vulnerable, immature child, seduced her, educated himself on her disabilities and weaknesses, including having her look up information on some of her disabilities, fed her insecurities, bribed her and worked hard to separate her from my parental influence, when I was taking her to therapy and he was doing this at the same time.

* * *

Harm and injury to my daughter and our family resulting from her experiences with this man, destroying her self-esteem and confidence, confusing identity issues and corrupting values, included several hospitalizations, self-inflicted injuries and suicide attempt, her lost opportunity for education and appropriate employment, destructive subsequent relationships, current issues that are severely impacting the lives of her two infant daughters, the impact on our family, the rest of us, the stress on the household, where four younger siblings were subjected to her acting out during and after this period of abuse, the impact on my concurrent health issues. At the time, I had cancer and I've since had two joint replacements. The harm and damage was not only living with the behaviors and those generated in others as a consequence of [my daughter's] abuse, but the expenses incurred related to the above, the loss of innocence and the multitude of lost positive opportunities for everyone, as I spent untold time, physical and emotional energy and resources, during and after the period of abuse, seeking therapy and support and services in dealing with the multitude of problems that were the outgrowth of the abuse that she endured.

Sent. Trans. pp. 27-29.

4

**b.     Restitution for Future Medical Services**

The Mandatory Restitution for Sexual Exploitation of Children Act, 18 U.S.C. § 2259, provides that "[an] order of restitution under this section shall direct the defendant to pay the victim . . . the full amount of the victim's losses as [caused by Defendant's crime] . . . [which] includes any costs incurred by the victim for . . . medical services relating to physical, psychiatric, or psychological care."  On the appeal in this matter, the Second Circuit held that "a restitution order pursuant to 18 U.S.C. § 2259 may include restitution for estimated future medical expenses" when the amount is reasonably ascertainable. Pearson, 2009 WL 1886055, at *5.

Determining the nature and cost of the mental health interventions that a victim of a child sexual abuse crime will need in the future is no easy matter.  However, other circuits have noted that 18 U.S.C. § 2259 is "'phrased in generous terms[] in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse.'"  United States v. Doe, 488 F.3d 1154, 1159-60 (9th Cir. 2007)(quoting United States v. Laney, 189 F.3d 954, 966 (9th Cir. 1999)).  Thus,

> although the breadth of the statutory language is circumscribed by the requirement of "a causal connection between the offense of conviction and the victim's harm," [Laney, 189 F.3d at 965], we and the other circuits addressing restitution orders under Section 2259 have not imposed a requirement of causation approaching mathematical precision.

Id.

Rather, the courts that have addressed restitution for future medical costs for child sexual abuse crime victims have "recognized that there might be cases where the amount of future counseling expenses would be too difficult to ascertain to justify an award, but [have] found [a] district court's 'estimate' of the amount the victim was likely to spend to be

5

justified." Id. (citations omitted).  In estimating such awards, the courts have been "mindful of the inherent uncertainties attendant upon an award of prospective damages," United States v. Danser, 270 F.3d 451, 455 n. 5 (7th Cir. 2001), but have also recognized the "strong Congressional intent behind section 2259" which is to allow the victims of child sexual abuse crimes to receive the counseling and treatment that they require.  Id. at 455.

Consequently, the courts have allowed "a district court significant discretion to make a reasonable estimate of an amount that reflects the full loss to the victim."  Doe, 488 F.3d at 1160 (citing Danser, 270 F.3d at 455 and United States v. Julian, 242 F.3d 1245, 1247 (10th Cir. 2001)).  Restitution is allowed in such circumstances even where there are pre-existing psychological problems but where there is a basis to conclude that the defendant's crime is a substantial cause of the need for future treatment. See United States v. Crandon, 173 F.3d 122, 126 (3d Cir.1999)("[I]t was entirely reasonable for the District Court to conclude that the additional strain or trauma stemming from [defendant's] actions was a substantial factor in causing the ultimate loss.").

> Thus, in every circuit to consider the causation requirement of Section 2259, a rule of reasonableness is applied. We will uphold an award of restitution under Section 2259 if the district court is able to estimate, based upon facts in the record, the amount of victim's loss with some reasonable certainty.

Doe, 488 F.3d at 1160.

The Court applies this rule of reasonableness in determining the "estimated future medical expenses" that each victim will incur as a result of Defendant's crimes.  Pearson, 2009 WL 1886055, at *5.[3]

---

[3] In Pearson, the Second Circuit noted that "[w]here further losses are likely but the amount cannot be calculated with reasonable certainty at the time of the initial sentence, a victim may nevertheless be able to secure compensation for the further losses pursuant to 18 U.S.C. § 3664(d)(5)." Pearson, 2009 WL

(continued...)

### c.     Jane Doe # 1

The Court has thoroughly reviewed all of the information presented to it, including Dr. Reagles's report and Jane Doe # 1's mother's statement, in reaching a restitution figure for her. The Court first addresses Dr. Reagles's report.

Many years prior to her involvement with Defendant, Jane Doe # 1 was labeled as learning disabled at school,[4] and diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, and an unspecified mood disorder that was manifested as depression and defiance. Reagles's Jane Doe # 1 Report, pp. 6-7.  Her ADHD, anxiety, and unspecified mood disorder were treated with prescription medications, and she received counseling from psychologists, school social workers, and therapists for a number of years prior to her involvement with Defendant. Id.  Approximately four month before her

---

[3](...continued)
1886055, at *5.  The Court does not find that this provision should be employed here.

Section 3664(d)(5) provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

18 U.S.C. § 3664(d)(5).

Based upon the evidence presented to the Court (as discussed more fully in the text), the costs of future medical expenses for each victim *are* ascertainable at this time. While the losses may not be determined with mathematical precision, they can be determined within a reasonable degree of certainty.  To conclude that the lack of mathematical precision in determining future losses requires resort to § 3664(d)(5) would, essentially, turn the rule of reasonableness on its head.  It would also open the door to numerous new applications on behalf of sexual abuse victims every time a treatment regimen is modified or extended. Surely, this is not the procedure that Congress had intended when it enacted § 2259.  Further, the use of such a procedure exposes the victims to the risk of denial of future treatment if the proponent is unable to demonstrate "good cause for the failure to include such losses in the initial claim for restitutionary relief." Id.

[4] Near the end of the academic year prior to her involvement with Defendant, Jane Doe # 1's classification at school was changed from "learning disabled" to "other health impaired."

involvement with Defendant, Jane Doe # 1 was diagnosed with a reactive attachment disorder and she embarked on a regimen of 12 two-hour counseling sessions that was on-going while she was being victimized by Defendant. Id.; see also fn. 2, *supra*.

Nevertheless, as reported by Dr. Reagles and by her mother, Jane Doe # 1's need for mental health interventions drastically increased following her victimization by Defendant. See Reagles's Jane Doe # 1 Report, pp. 7-9; fn. 2, *supra*. This included several mental health hospitalizations, an episode of self-mutilation, and a suicide attempt. See Reagles's Jane Doe # 1 Report, pp. 7-9. Dr. Reagles addressed the "competing factors" for Jane Doe # 1's post-victimization "psychiatric disablement" and concluded that "her pre-existing need for counseling and medications pales as a competing alternative cause of her present and ongoing emotional and behavioral reactions." Reagles's Jane Doe # 1 Report, p. 10.

Upon review of the information available to him including consultation with current treatment providers, and based upon his own education, training, and experience in the fields of psychology and rehabilitation,[5] Dr. Reagles opined that, as a result of her victimization by Defendant, Jane Doe # 1

> would need periodic psychiatric evaluations (four times a year) and a regimen of medications for the rest of her life, estimated to be a period of 39 years; personal counseling once a week for the next seven years and twelve to sixteen times a year for the twenty-seven years after that; and group counseling twice a month for five years.

Pearson, 2009 WL 1886055, at *2, n. 1 (citations to record omitted). Dr. Reagles

---

[5]Dr. Reagles *curriculum vitae* indicates that he has a Ph. D in rehabilitative counseling psychology; a M.S. in counseling and guidance; is the owner of K.W. Reagles & Associates, L.L.C., a business that provides, *inter alia,* "psychological counseling services;" and was the co-owner and Administrative Director for 14 years of "Pelion, Inc., an outpatient clinic at which medical and counseling services were offered to a variety of pertinent populations, including victims of trauma . . . ."

estimated that this mental health services regimen, including medications, will cost $2,002,732.00.[6]

Based upon the information before the Court, there is no doubt in the Court's mind that: (1) Defendant's crimes are the primary causative factor for Jane Doe # 1's need for the drastically increased mental health interventions required after her victimization by Defendant; and (2) Jane Doe # 1 will need these mental health interventions well into the future.  See Pearson, 2009 WL 1886055, at * 5 ("the record contains evidence of the victims' need for long term counseling").  Thus, the restitution order will include the future medical costs that Jane Doe # 1 will likely incur as a result of Defendant's crimes.

The Court accepts and credits Dr. Reagles's conclusions that Jane Doe # 1 will need the components of the care plan that he set forth in his report, including the need for periodic evaluations and the recommended therapeutic modalities (including individual and group therapies, and medications). See Reagles' Jane Doe # 1 Report, pp. 12-16. However, because Jane Doe # 1 presented with some mental health issues prior to her involvement with Defendant, the Court cannot conclude that the full extent of the mental health interventions she now requires are causally related to Defendant's crimes. While the Court does not disagree with Dr. Reagles's assessment that Jane Doe # 1's psychiatric disablement is primarily caused by her victimization by Defendant, it does not find that the full of extent of her losses are caused by Defendant's crimes.

---

[6]For each treatment, Dr. Reagles provided the present annual cost which he appreciated "by a percentage factor equivalent to the annual change in appropriate elements of the Medical Price Index for the past 10 years, viz. 4.6% per year" to arrive at the cost of future treatments. See Jane Doe # 1 Report, p. 14. His total estimates are based on his estimated treatment requirements and the estimated cost for each treatment.  Dr. Regales also provided a total for these treatments reduced to present value, but the Court rejects using the present value because Defendant does not, at this time, have the capacity to pay the present value of these treatments.

9

Further, the information before the Court indicates that, although she was subjected to an extremely traumatic experience that has left an indelible mark requiring long-term mental health treatment, Jane Doe # 1 has already made some progress, albeit minimal, through her current treatment regimen.  Despite that Jane Doe # 1 suffers from the psychological impact of her victimization, she has been able to enter the work force, marry, and have and care for children.  Based upon the progress that Jane Doe # 1 has experienced through treatment, the Court cannot conclude that all of the mental health treatments, or the full length of all such treatments, predicted by Dr. Reagles will be necessary.

The Court concludes, based upon the constellation of factors before it, that, as a result of Defendant's crimes, Jane Doe # 1's losses will amount to $667,577.00.  This number constitutes the costs of one-third of the mental health interventions recommended by Dr. Reagles, and factors in Jane Doe #1's pre-existing conditions and the likelihood, based upon her progress to date, that the necessary length and intensity of the treatment regimen will be less than that recommended by Dr. Reagles. Accordingly, restitution for Jane Doe # 1 is set at $667,577.00 pursuant to 18 U.S.C. § 2259.

### d.    Jane Doe # 2

Like with Jane Doe # 1, the Court has thoroughly reviewed all of the information presented to it, including Dr. Reagles's report and Jane Doe # 2's mother's statement, in reaching a restitution figure for Jane Doe # 2. The Court first addresses Dr. Reagles's report.

Dr. Reagles reported that more than a year before her contact with Defendant, Jane Doe # 2 was diagnosed with major depression without psychosis and an oppositional

and defiant disorder, and prescribed certain medications. Reagles's Jane Doe # 2 Report, p. 2.  Moreover, in the one-year period immediately preceding her involvement with Defendant, Jane Doe # 2 received inpatient and emergency room treatment on several occasions, and participated in psychotherapy sessions. Id. pp. 2-3. However, Jane Doe # 2's need for mental health interventions has drastically increased since her interactions with Defendant. See id. pp. 3-6; fn. 1, *supra*.  Since her victimization by Defendant, Jane Doe # 2 has been diagnosed with a post-traumatic stress disorder, a panic and anxiety disorder, depression without psychosis, and has been prescribed numerous medications. Reagles's Jane Doe # 2 Report, pp. 3-4.  After her victimization, Jane Doe # 2 went through a period of self-mutilation, experienced flashbacks that disrupted her sleep and caused her to experience chronic fatigue, id. p. 3, and attempted suicide. See fn. 1, *supra.*

      Dr. Reagles addressed the "potentially competing causative factors" for Jane Doe # 2's post-victimization "psychiatric disablement" and concluded that her "pre-existing need for counseling and medications are a minimal factor as a competing alternative cause for her ongoing emotional and behavioral reactions." Id., p. 5. Upon review of the information available to him including consultation with current treatment providers, and based upon his own education, training, and experience in the fields of psychology and rehabilitation, Dr. Reagles opined that, as a result of her victimization by Defendant, Jane Doe # 2 would

> need periodic psychiatric evaluations (four times a year) and a regimen of medications for the rest of her life, estimated to be a period of 42.2 years; personal counseling once a week for the next three years and eight to ten times a year for rest of her life after that; and group counseling twice a month for four years.

Pearson, 2009 WL 1886055, at *2, n. 1 (citations to record omitted).  Dr. Reagles

11

estimated these services would cost $921,976.00.[7]

Dr. Reagles and Jane Doe # 2's mother presented a compelling picture of an emotionally frail young woman who has grappled with severe emotional and psychological issues since her involvement with Defendant.  Like with Jane Doe # 1, there is no doubt in the Court's mind that: (1) Defendant's crimes are the primary causative factor for Jane Doe # 2's need for the drastically increased mental health interventions she now requires; and (2) Jane Doe # 2 will need these mental health interventions well into the future. The Court accepts and credits Dr. Reagles's conclusions that Jane Doe # 2 will need the components of the care plan that he set forth in his report, including the need for periodic evaluations and the recommended therapeutic modalities (which involve individual and group therapies, and medications). See Reagles's Jane Doe # 2 Report, pp. 6-11. Nevertheless, because she presented with some mental health issues before her involvement with Defendant, the Court cannot conclude that the full extent of the necessary mental health interventions are proximately caused by Defendant's crimes.

Also like Jane Doe # 1, Jane Doe # 2 has made moderate progress through her mental health treatment in an attempt to ameliorate the effects of her sexual exploitation and to restore some semblance of normality to her life. Jane Doe # 2 has been able, with certain accommodations, to obtain her New York State High School General Equivalency Diploma ("GED");[8] to engage in full time employment; and attend community college on a

---

[7] This amount was reached by the same method as used for Jane Doe #1.  See fn. 6, *supra*.

[8] Dr. Reagles reports that when Jane Doe # 2 returned to school to take her GED classes, her father would have to wait in the car outside of the school "because she was so traumatized by what happened to her at the hands of Mr. Pearson[] that she could only remain in class for 45 minutes before she would have to excuse herself to return to the security or her father in the car."  Reagles Jane Doe # 2 Report, p. 4.

full-time basis. Inasmuch as Jane Doe # 2 has made some progress through her mental health interventions since being victimized by Defendant, and is likely to make more, see Reagles Jane Doe # 2 Report, p. 5 (opining that Jane Doe # 2 is "a very determined young woman who, with proper treatment and support, has a good chance of overcoming the sexual abuse and trauma" she has been subjected to by Defendant), the Court finds that the necessary length and intensity of Jane Doe # 2's treatment regimen will be less than recommended by Dr. Reagles.

The Court concludes, based upon the constellation of factors before it, that, as a result of Defendant's crimes, Jane Doe # 2's losses will amount to $307,325.00. This number constitutes one-third of the costs of the mental health interventions recommended by Dr. Reagles, and factors in Jane Doe # 2's pre-existing conditions and the likelihood, based upon her progress to date, that the necessary length and intensity of the treatment regimen will be less than that recommended by Dr. Reagles. Accordingly, restitution for Jane Doe # 2 is set at $307,325.00 pursuant to 18 U.S.C. § 2259.

### III. CONCLUSION

For the reasons set forth above, the Court calculates Defendant's restitution to Jane Doe # 1 to be $667,577.00, and Defendant's restitution to Jane Doe # 2 to be

13

$307,325.00, for total restitution in the amount of $974,902.00.  The Clerk is directed to enter an Amended Judgment, addressed to restitution only, consistent with this Decision and Order.  All other terms of the original Judgment shall remain the same. The Court directs the Clerk of the Court to append this Decision and Order to the Amended Judgment and distribute it to the appropriate parties.

**IT IS SO ORDERED**

DATED: July 29, 2009

_____
Thomas J. McAvoy
Senior, U.S. District Judge